

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. (EP) |
| | : | |
| v. | : | Criminal No. 24-402 |
| | : | |
| ZHENGMING PAN | : | <u>Count One</u> |
| | : | 18 U.S.C. § 371 |
| | : | (Conspiracy to Violate the Foreign |
| | : | Corrupt Practices Act) |
| | : | |
| | : | <u>Count Two</u> |
| | : | 15 U.S.C. § 78dd-1 |
| | : | 15 U.S.C. § 78ff(c)(2)(A) |
| | : | 18 U.S.C. § 2 |
| | : | (Foreign Corrupt Practices Act – |
| | : | Anti-Bribery Violation) |
| | : | |
| | : | <u>Counts Three and Four</u> |
| | : | 15 U.S.C. § 78m(b)(2)(A) |
| | : | 15 U.S.C. § 78m(b)(5) |
| | : | 15 U.S.C. § 78ff(a) |
| | : | 18 U.S.C. § 2 |
| | : | (Foreign Corrupt Practices Act – |
| | : | Books and Records Violation) |

## I N D I C T M E N T

The Grand Jury in and for the District of New Jersey, sitting at Newark,

charges:

## COUNT ONE
### (Conspiracy to Violate the Foreign Corrupt Practices Act)

### Relevant Statutory Background

1.     The Foreign Corrupt Practices Act of 1977, as amended, Title 15

United States Code, Sections 78dd-1, *et seq.* (the "FCPA"), was enacted by Congress

for the purpose of, among other things, making it unlawful for certain classes of

persons to act corruptly in furtherance of an offer, promise, authorization, or payment

of money or anything of value, directly and indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

2.    Further, the FCPA's accounting provisions, among other things, (i) require every issuer of publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934 (the "Securities Exchange Act"), Title 15, United States Code, Section 78l, (a) to file periodic reports with the United States Securities and Exchange Commission ("SEC") under Section 15(d) of the Securities Exchange Act, Title 15, United States Code, Section 78o(d), and (b) to make and keep books, records, and accounts that accurately and fairly reflect transactions and the distribution of the company's assets; and (ii) prohibit the knowing and willful falsification by any person of an issuer's books, records, or accounts, Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), and 78ff(a).

### Relevant Individuals and Entities

3.    At all times relevant to this Indictment, unless otherwise specified:

a.    Bit Mining, Ltd. (the "Company") was a cryptocurrency mining company incorporated in the Cayman Islands, with a principal executive office located in Hong Kong. The Company had a class of publicly traded securities that were listed on the New York Stock Exchange ("NYSE") under the ticker symbol "BTCM."

b.    From in or around 2017 through in or around 2019, the Company—then operating under the name 500.com Ltd. ("500.com")—was a Chinese online sports lottery company incorporated in the Cayman Islands, with a principal executive

office in Shenzhen, China. In addition to its then-existing lines of business, 500.com sought to develop and open an Integrated Resort ("IR") in Japan. 500.com had a class of publicly traded securities that were listed and traded on the NYSE and the National Association of Securities Dealers Automated Quotations ("NASDAQ") under the ticker symbol "WBAI." Effective April 20, 2021, 500.com changed its NYSE ticker symbol from WBAI to BTCM. The Company was an issuer of publicly traded securities registered with the SEC pursuant to Section 12(b) of the Securities Exchange Act, Title 15, United States Code, Section 78l, and was required to file periodic reports with the SEC under Section 13 of the Securities Exchange Act. Thus, the Company was an "issuer" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(a) and 78m(b).

c.    500.com Nihon ("500.com Japan") was a wholly owned subsidiary of 500.com headquartered in Tokyo, Japan. 500.com Japan was created in furtherance of 500.com's efforts to enter the IR market in Japan. 500.com Japan was under the direction and control of 500.com, and its books, records, and accounts were included in the consolidated financial statements of 500.com that were filed with the SEC. 500.com Japan was an "agent" of 500.com, an "issuer," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

d.    The defendant ZHENGMING PAN ("PAN") was a Chinese citizen and resident and was Chief Executive Officer of 500.com from in or around 2014 to in or around 2020. PAN was also a director of 500.com Japan. PAN's business

responsibilities included oversight and management of 500.com, 500.com Japan, and 500.com's other subsidiaries, including business development, strategy, operations, and finance. PAN was an "officer," "employee," and "agent" of 500.com, an "issuer," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

    e.    The "500.com Consultants," individuals whose identities are known to the Grand Jury, were Chinese and Japanese citizens who were engaged as consultants by 500.com to assist 500.com in its efforts to enter the Japanese IR market. The 500.com Consultants were each "agents" of 500.com, an "issuer," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a), and included the following individuals:

        i.    "500.com Consultant 1," a Chinese citizen and Japanese resident who 500.com engaged as a consultant and translator to assist 500.com in its efforts to enter the Japanese IR market.

        ii.    "500.com Consultant 2" and "500.com Consultant 3," each a Japanese citizen and resident who 500.com engaged as consultants to assist 500.com in its efforts to enter the Japanese IR market.

    f.    "Japanese Official 1," an individual whose identity is known to the Grand Jury, was a citizen of Japan and member of the Japanese national legislature. Japanese Official 1 also served as an executive official of the Japanese government with a portfolio that included infrastructure, transport, and tourism during the relevant time period. Japanese Official 1 was a "foreign official" as that

term is defined in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

g.     "Japanese Official 2," an individual whose identity is known to the Grand Jury, was a citizen of Japan and was a close aide to Japanese Official 1. Japanese Official 2 was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

## Overview of the Conspiracy

4.     From in or around 2017 to in or around December 2019, PAN knowingly and willfully conspired and agreed with others to: (i) corruptly offer and pay money and other things of value to foreign officials in Japan to secure improper advantages in order to obtain and retain business for 500.com, contrary to Title 15, United States Code, Section 78dd-1(a); and (ii) maintain false books, records, and accounts that did not accurately and fairly reflect the transactions and dispositions of the assets of 500.com, contrary to Title 15, United States Code, Sections 78m(b)(2)(A) and 78m(b)(5).

5.     In furtherance of the scheme, PAN and his co-conspirators corruptly offered and paid approximately $1.9 million to (i) Japanese officials and (ii) the 500.com Consultants, while knowing that the 500.com Consultants would pay the funds, at least in part, to or for the benefit of Japanese officials, in order to obtain and retain business and other advantages for and on behalf of 500.com, specifically to assist 500.com in its efforts to enter the IR market in Japan. The payments were made with PAN's knowledge, authorization, and at his direction, and PAN directly participated in discussions about the bribe amounts, method of payment, and

concealment efforts.

6.    In connection with the bribery scheme, and in order to facilitate and conceal the corrupt payments, from at least in or around 2017 to in or around 2019, PAN knowingly and willfully falsified Sarbanes-Oxley certifications and caused bribe payments to be falsely recorded as legitimate expenses, including as "Management expense_advisory fees," in 500.com's consolidated books, records, and accounts.

## The Conspiracy

7.    From in or around 2017 through at least in or around December 2019, in the District of New Jersey and elsewhere, the defendant,

### ZHENGMING PAN,

together with 500.com, 500.com Japan, the 500.com Consultants, and others did knowingly and willfully combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, that is:

(a)    being an officer, employee and agent of an issuer, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to any person while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised, directly and indirectly, to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such

foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist 500.com in obtaining and retaining business, and directing business to, 500.com, to wit: ZHENGMING PAN directed and authorized 500.com and its agents to pay and cause to be paid $1.9 million in bribes and payments to intermediaries, while knowing that all or a portion of such money or thing of value would be offered, given, or promised, directly and indirectly, to any foreign official to secure and obtain improper business advantages to assist 500.com in opening an IR in Japan, contrary to Title 15, United States Code, Sections 78dd-1 and 78(ff)(c)(2)(A); and

(b) to knowingly and willfully, directly and indirectly, falsify and cause to be falsified books, records, and accounts required, in reasonable detail, to accurately and fairly reflect the transactions and dispositions of the assets of 500.com, contrary to Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), and 78ff(a).

## Goal of the Conspiracy

8.    The goal of the conspiracy was for PAN and his co-conspirators to (i) gain improper business advantages for 500.com, including support for 500.com's bid to open an IR in Japan, by paying bribes to Japanese government officials, directly and through the 500.com Consultants; and (ii) conceal bribes paid to the Japanese government officials by causing corrupt payments to be falsely recorded in 500.com's

consolidated financial records.

## Manner and Means of the Conspiracy

9.      It was part of the conspiracy that:

### The Bribery Scheme

a.      In or around 2016, the Japanese National Diet was considering legislation that would allow for the construction of IRs—large resorts that would include hotels and casinos, as well as retail, dining, convention facilities, and entertainment venues—in Japan (the "IR Legislation").

b.      At that time, 500.com did not operate in Japan.

c.      In or around March 2017, 500.com, under PAN's direction, began to pursue a potential opportunity to open an IR in Japan. In order to place 500.com in the best position to benefit from the IR Legislation, PAN caused 500.com to create a Japanese subsidiary, 500.com Japan.

d.      From in or around March 2017 to in or around September 2017, PAN caused 500.com to engage the 500.com Consultants to assist 500.com in paying bribes to Japanese Official 1, Japanese Official 2, and other members of the Japanese National Diet. PAN caused 500.com and the 500.com Consultants to pay these bribes to secure an improper business advantage for 500.com, including to ensure the success of 500.com's bid to open an IR in Japan.

e.      To accomplish the objectives of the scheme, PAN communicated with co-conspirators and with the 500.com Consultants using e-mail, text messages, messaging applications, and other forms of communications.

f.      PAN paid and caused to be paid bribes to Japanese government officials in the form of cash, wire transfers, gifts, travel, and entertainment, which are described below. PAN and his co-conspirators also created and caused to be created false and misleading invoices and billing documents to conceal the bribe payments.

g.      Despite these bribes, 500.com ultimately did not win the bid to open an IR.

## A. Lecture Fee Bribe

h.      From the inception of the scheme, the 500.com Consultants discussed the need to make corrupt payments to successfully bid for an IR. On or about July 14, 2017, 500.com Consultant 1 texted 500.com Consultant 2, stating "[PAN] felt relatively negative about . . . head-on competition with a major company in Europe or the U.S. in open application." In reply, 500.com Consultant 2 texted a message stating: "That's true. That's why we're aiming for cities where under-the-table deals can be used. These would be cities such as Rusutsu, Okinawa, etc."[1]

i.      Subsequently, in or around August 2017, PAN caused the payment of a bribe to Japanese Official 1 in the amount of approximately ¥2 million (approximately $26,395), concealed as a "lecture fee."

j.      Specifically, on or about August 4, 2017, 500.com hosted an IR symposium in Okinawa, Japan to announce its desire to establish an IR in that city

---

[1] Quoted messages have been translated from the original Japanese and/or Chinese to English.

and to invest, with others, between ¥100 billion to ¥300 billion in the area (approximately $676 million to $2.03 billion). At PAN's direction, 500.com invited Japanese Official 1 to speak at the event and approved and paid a lecture fee to Japanese Official 1 in the amount of ¥500,000 (approximately $4,600).

      k.    On or about August 5, 2017, the day after the symposium, Japanese media publicly reported that Japanese Official 1 would be named to a senior position in the executive branch with a portfolio including infrastructure, transport, and tourism. In this role, Japanese Official 1 would be in charge of tourism and casino promotions, overseeing IRs.

      l.    On or about August 5, 2017, the same day that Japanese Official 1's new role was announced, two of the 500.com Consultants discussed an additional payment to Japanese Official 1 in the amount of approximately ¥2 million. 500.com Consultant 3 texted 500.com Consultant 2 stating, "The appointment of [Japanese Official 1] is on Monday . . . I have made the following arrangements with [Japanese Official 2]. (1) Speaking fee: 200 is OK."

      m.    500.com Consultant 1 and 500.com Consultant 3 exchanged text messages discussing PAN's desire to route this "reward payment" to Japanese Official 1 through one of 500.com Consultant 3's companies in order to conceal it. On or about August 7, 2017, 500.com Consultant 1 texted, "[PAN] feels it may become troublesome [to wire the additional payment directly from 500.com to a company owned by Japanese Official 1], should something unexpected happen. Accordingly, he desires to do this through the company owned by [500.com Consultant 3]."

n.    On or about August 5, 2017, 500.com Consultant 3 submitted an invoice to 500.com for approximately ¥2.4 million in the name of 500.com Consultant 3's company citing Japanese Official 1's "lecture fee."

o.    Pursuant to this invoice, on or about August 31, 2017, 500.com sent a payment of approximately ¥2.4 million to an account controlled by 500.com Consultant 3, which had been opened three months prior. PAN approved this payment, in addition to having approved the earlier approximately ¥500,000 payment for the same lecture fee.

p.    In or around late August 2017, 500.com Consultant 3 transferred the approximately ¥2,000,000 to a company controlled by Japanese Official 1.

q.    In subsequent conversations, 500.com Consultant 1 and 500.com Consultant 2 explicitly discussed that the ¥2,000,000 lecture fee was intended as a bribe. For example, on or about September 18, 2017, while discussing the difficulties of paying a separate large cash bribe to Japanese Official 1 and other Japanese officials, 500.com Consultant 2 sent a voice message through a messaging application to 500.com Consultant 1, stating: "When I told you that we would not be able to reveal our plot of paying some to [Japanese Official 1], you responded that 500.com might be able to treat such an amount without any difficulty under the table. . . . But, this time, the amount we are talking about is large." 500.com Consultant 1 replied via voice message: "In [Japanese Official 1's] case, well, there was an actual speech given. Thus some cash was wired to [500.com Consultant 3's] corporate bank account for 500.com as a lecture fee, then [500.com Consultant 3] handled it afterward. That's

why it was OK. We were entirely OK to transfer funds to another corporation as a lecture fee payment—this time. There are no specific reasons for expensing cash, which is several times more than before. That is why [PAN] said it would be difficult."

**B. Cash Bribes**

r.     In or around September 2017, PAN and his co-conspirators paid and caused to be paid bribes to Japanese Official 1, Japanese Official 2, and other Japanese government officials in the amount of approximately ¥26.5 million in cash (approximately $233,715). At PAN's direction, 500.com Consultant 2 and 500.com Consultant 3 hand-delivered a portion of this cash to the foreign officials' offices in Tokyo, Japan. These payments were intended to secure improper business advantages for 500.com in Japan, including access to non-public information and influence over the IR bidding process.

s.     PAN directed the 500.com Consultants to find a method to justify and conceal the purpose of these funds. The 500.com Consultants exchanged text messages regarding these efforts.

t.     For instance, on or about September 18, 2017, 500.com Consultant 1 wrote to 500.com Consultant 2 "rather than bringing cash to Japan . . . I wonder if it is easier . . . [for] 500.com to wire the fund to the account first, then withdraw cash in Japan. . . in addition, PAN[ ] wants to know how much monies will be handed to the representative after we transfer it either to [a 500.com Consultant] or [a different 500.com Consultant]. Well, the last time the money was deposited by the corporation in the form of lecture fees. However, this time, such a political

contribution is no good. Thus, I need to explain to PAN[ ] how the monies will be transferred and how to confirm the receipt of the funds."

　　　　u.　　On or about that same day, 500.com Consultant 2 responded to 500.com Consultant 1, "[t]hat is why the best way not to be discovered is to bring cash on a hand-carry basis, which will not leave any trails." 500.com Consultant 1 then noted, "In addition, [PAN] is now thinking. That is, without any rationale or reason, to withdraw the funds from the company is not possible. He has to find a proper reason to follow suitable financial treatments."

　　　　v.　　PAN directed, actively supervised, and closely tracked the efforts to pay these bribes. On or about September 21, 2017, PAN sent a voice message to two 500.com Consultants, including 500.com Consultant 1, asking for confirmation regarding the amount of the bribes, and noting that he had discussed the amount with a 500.com employee. PAN stated "How much did you say that fee is ultimately? I thought it was 21 million, might need to add some odd amount or something, we'll see. If it's to be paid in Japanese yen, we'll just pay in Japanese yen. So why did [500.com employee] tell me today that it is more than 26 million?"

　　　　w.　　Later that day, 500.com Consultant 1 replied to PAN with screenshots of his text messages with 500.com Consultant 2 showing a breakdown of the bribe payments and the intended recipients. The screenshots showed that 500.com intended to pay approximately ¥800,000 to Japanese Official 1, approximately ¥50,000 to Japanese Official 2, and to make additional bribe payments ranging from approximately ¥200,000 to ¥600,000 to other members of the Japanese

National Diet.

x.    PAN then responded to 500.com Consultant 1 that same day, September 21, 2017, via a voice message stating, "Okay, I understand, understood."

y.    In order to conceal the nature of the bribe payments, PAN caused 500.com to enter into a sham IR consulting agreement to justify the large wire transfer it used to fund the bribes. In or around September 2017, 500.com signed a consulting agreement with a Singaporean subsidiary of a Japanese marketing and media resource company for which 500.com Consultant 1 served as director and senior manager ("Consulting Company 1"). This consulting agreement was purportedly to commission an "IR Research Report." Consulting Company 1 never created or delivered this report.

z.    On or about September 22, 2017, PAN caused 500.com to wire approximately $233,715.45 to Consulting Company 1's bank account through a bank account held at Bank 1 in the United States. On or about September 26, 2017, Consulting Company 1 wired the identical amount to an account owned by an associate of 500.com Consultant 2. On or about that same day, 500.com Consultant 2 withdrew, in Hong Kong dollars, the equivalent of $233,707.11 in Hong Kong and converted it to Japanese Yen. Two days later, 500.com Consultant 2 and 500.com Consultant 3 personally delivered cash bribes to Japanese Official 1 and Japanese Official 2, as well as to other Japanese lawmakers, at their offices in Japan.

C. **Travel, Entertainment, and Gifts**

aa.    In addition, PAN and his co-conspirators paid and caused to be

paid bribes in the form of luxury trips for Japanese Official 1, Japanese Official 2, and several other Japanese officials, including private jet travel, shopping sprees, and entertainment. These trips were an effort to improperly obtain the Japanese Officials' support for 500.com's bid to open an IR in Japan.

bb.    In or around December 2017, PAN caused 500.com to pay approximately $216,527 for a trip to Macao, China, for several Japanese officials, including Japanese Official 1 and Japanese Official 2. PAN and the 500.com Consultants also attended the trip. Although the trip included a short visit to 500.com's offices in Shenzhen and a business presentation, PAN and 500.com primarily used the trip as an opportunity to pay for flights on a private jet, gambling chips, luxury goods and meals, sex workers, and five-star accommodations, as well as to distribute cash bribes to each of the Japanese officials who attended, including Japanese Official 1 and Japanese Official 2.

cc.    For example, PAN and the 500.com Consultants discussed purchasing luxury goods, such as a Celine handbag, for some of the officials on the trip. On or about December 28, 2017, PAN sent a voice message to the 500.com Consultants via WeChat stating, "I will buy the item. Celine product? Well, let's look at how much does it cost. As he is a Diet member. What do you [] think? Should it be better to buy, we may better buy it. . . . We have already prepared monies."

dd.    After the Macao trip, 500.com Consultant 2 and Japanese Official 2 discussed concealing the bribes by making it appear as though Japanese Official 1 and Japanese Official 2 had reimbursed 500.com for the cost of the trip.

500.com issued false invoices for these costs, but 500.com did not expect to be, and was not, reimbursed.

  ee. On or about February 5, 2018, the 500.com Consultants discussed PAN's concerns that the bribes had not yet secured Japanese Official 1's support for 500.com's IR bid. 500.com Consultant 1 sent a WeChat message to 500.com Consultant 3 stating: "However, PAN[ ] stated 'Honestly speaking, it was not clear how the line through [Japanese Official 1] had been functioning for us.' So far, he has not stated clearly that he would support 500, has he? With respect to the matter, I would appreciate it if [Japanese Official 1] would tell PAN[ ] next time that he would support 500 in terms of the matter concerning IR."

  ff. In or around February 2018, PAN caused 500.com to pay approximately $6,871 for a ski trip to Hokkaido, Japan for Japanese Official 1 and his family and Japanese Official 2. PAN did not attend, but approved payment for all expenses during the trip, which included lift tickets, ski equipment, snowmobiles, hot springs visits, and other entertainment for the officials and family members.

  gg. During the Hokkaido trip, PAN communicated directly with the 500.com Consultants in attendance and supervised their efforts. While in Hokkaido, on or about February 11, 2018, one of the 500.com Consultants texted PAN to report: "Japanese Official 1 is still extremely happy because ordinarily he never sees his sons. While eating he expressed his position – he will exhaust all efforts to bring IR here." PAN responded: "This is indeed good news!"

  hh. In addition to the cash bribes, travel, gifts, and entertainment for

the Japanese government officials, PAN caused 500.com to pay approximately $999,244 to the 500.com Consultants, approximately $370,774 to Consulting Company 1, and approximately $55,422 in reimbursements for various expenses associated with the bribe payments, all to facilitate and conceal the corrupt payments in order to obtain or retain business for 500.com.

### False Books and Records

ii.     In furtherance of the scheme, PAN caused bribe payments related to its efforts to open an IR in Japan to be falsely recorded as legitimate expenses, including consulting payments, in 500.com's internal accounting records. Therefore, PAN knowingly and willfully conspired and agreed with others to cause the bribe payments to be falsely recorded as legitimate expenses in 500.com's books, records, and accounts.

jj.     For instance, on or about September 21, 2017, PAN caused 500.com to enter into a sham contract with Consulting Company 1 agreeing to pay approximately ¥26,300,000 ($233,715.45) for "IR research and reports" that were never prepared or delivered. On or about that same day, PAN caused Consulting Company 1 to issue a false invoice to 500.com for "IR research and reports" for the same amount. On or about September 22, 2017, PAN caused a wire payment of approximately $233,715.45 from 500.com to Consulting Company 1's bank account—through a Bank 1 correspondent bank account in the United States—for the purpose of making bribe payments to various Japanese officials, and caused that payment to be falsely recorded as "Management expense_advisory fees" in 500.com's consolidated

books and records.

        kk.    Also in furtherance of the scheme, PAN signed false Sarbanes-Oxley certifications in 500.com's consolidated books, records, and accounts. Specifically, in or around April 2018 and April 2019, PAN, as Chief Executive Officer of 500.com, signed annual Sarbanes-Oxley certifications that falsely stated that PAN had disclosed to 500.com's auditors and Board of Directors "any fraud, whether or not material, that involves management." These certifications failed to disclose, among other things, the bribe payments to the various Japanese officials described herein, and the existence of false books, records, and accounts related to facilitating and concealing those payments. These certifications were filed electronically through SEC servers located in the District of New Jersey.

### Overt Acts

        10.    In furtherance of the conspiracy, and to achieve its illegal objectives, PAN and one or more of his co-conspirators committed, and caused to be committed, the following overt acts in the District of New Jersey and elsewhere:

        a.    On or about August 5, 2017, PAN caused 500.com Consultant 3 to submit an invoice to 500.com for approximately ¥2.4 million in the name of 500.com Consultant 3's company that was falsely recorded as Japanese Official 1's "lecture fee" when it was, in fact, intended to fund a bribe to Japanese Official 1.

        b.    On or about August 29, 2017, PAN caused 500.com to send a payment of approximately ¥2.4 million to an account controlled by 500.com Consultant 3.

      c.     On or about August 31, 2017, an account controlled by 500.com Consultant 3 wired ¥2 million to a company controlled by Japanese Official 1.

      d.     On or about September 21, 2017, PAN caused 500.com to enter into a sham contract with Consulting Company 1 agreeing to pay approximately ¥26,300,000 ($233,715.45) for "IR research and reports" that were never prepared or delivered.

      e.     On or about September 21, 2017, the same day, PAN caused Consulting Company 1 to issue a false invoice to 500.com for "IR research and reports" for the same amount, approximately ¥26,300,000 ($233,715.45).

      f.     On or about September 21, 2017, PAN sent a voice message to two 500.com Consultants, including 500.com Consultant 1, asking to confirm the amount of cash bribes to be paid to Japanese government officials.

      g.     On or about September 21, 2017, 500.com Consultant 1 replied to PAN's voice message with screenshots of his text messages with 500.com Consultant 2 showing a breakdown of the bribe payments and the intended recipients, including Japanese Official 1 and Japanese Official 2.

      h.     On or about September 22, 2017, PAN caused 500.com to wire approximately $233,715.45 to Consulting Company 1's bank account—through a Bank 1 correspondent bank account in the United States—for the purpose of making bribe payments to various Japanese government officials.

i.      On or about September 26, 2017, approximately $233,715.45 was transferred from Consulting Company 1's bank account to an account owned by an associate of 500.com Consultant 2.

j.      On or about September 26, 2017, 500.com Consultant 2 withdrew, in Hong Kong dollars, the equivalent of approximately $233,707.11 and converted it to Japanese Yen.

k.      On or about September 28, 2017, 500.com Consultant 2 and 500.com Consultant 3, acting on behalf of 500.com, personally delivered cash bribes to Japanese government officials, including Japanese Official 1 and Japanese Official 2, at their offices in Japan.

l.      In or around December 2017, PAN caused 500.com to pay approximately $216,527 for a trip to Macao, China attended by several Japanese government officials, including Japanese Official 1 and Japanese Official 2.

m.      On or about December 28, 2017, PAN sent a message to the 500.com Consultants via WeChat discussing the purchase of a luxury item for a Japanese government official who attended the trip to Macao, China.

n.      In or around February 2018, PAN caused 500.com to pay approximately $6,871 for a ski trip to Hokkaido, Japan for Japanese Official 1, his family, and Japanese Official 2.

o.      On or about April 27, 2018, PAN, as Chief Executive Officer of 500.com, signed an annual Sarbanes-Oxley certification that was filed electronically through SEC servers located in the District of New Jersey, which falsely stated that

PAN had disclosed to 500.com's auditors and Board of Directors "any fraud, whether or not material, that involves management" for the year ending December 31, 2017.

          p.      On or about April 22, 2019, PAN, as Chief Executive Officer of 500.com, signed an annual Sarbanes-Oxley certification that was filed electronically through SEC servers located in the District of New Jersey, which falsely stated that PAN had disclosed to 500.com's auditors and Board of Directors "any fraud, whether or not material, that involves management" for the year ending December 31, 2018.

      In violation of Title 18, United States Code, Section 371.

## COUNT TWO
### Foreign Corrupt Practices Act

1.    The allegations in paragraphs 1 through 6 and 8 through 10 of Count One of this Indictment are realleged here.

2.    On or about September 22, 2017, in an offense begun and committed out of the jurisdiction of any particular State or district, the defendant,

### ZHENGMING PAN,

who will be first brought to and arrested in the United States, being an officer, employee and agent of an issuer, did willfully use the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist 500.com in obtaining and retaining business, for and with, and directing business to, 500.com and others, to wit: PAN authorized 500.com to use a wire transfer to pay and cause to be paid approximately $233,715.45 from 500.com's bank account in China to

Consulting Company 1's bank account in Singapore, routed through a correspondent bank account at Bank 1 in the United States, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly and indirectly, to any foreign official to secure the bid to build an IR in Japan.

In violation of Title 15, United States Code, Sections 78dd-1 and 78ff(c)(2)(A), and Title 18, United States Code, Section 2.

## COUNTS THREE TO FOUR
### (False Books and Records)

1.     The allegations in paragraphs 1 through 6 and 8 through 10 of Count One of this Indictment are realleged here.

2.     On or about the dates set forth below, in the District of New Jersey and elsewhere, the defendant,

### ZHENGMING PAN,

did knowingly and willfully, directly and indirectly, falsify and cause to be falsified books, records, and accounts required, in reasonable detail, to accurately and fairly reflect the transactions and dispositions of the assets of 500.com, an issuer of securities registered pursuant to the Securities Exchange Act of 1934, and an issuer within the meaning of the FCPA, as set forth below:

| COUNT | APPROXIMATE DATE | FALSIFIED RECORD |
|-------|------------------|------------------|
| Three | April 27, 2018 | Sarbanes-Oxley Section 302 Annual Chief Executive Officer Certification on Form 20-F for the Year Ended December 31, 2017. |
| Four | April 22, 2019 | Sarbanes-Oxley Section 302 Annual Chief Executive Officer Certification on Form 20-F for the Year Ended December 31, 2018. |

In violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), and 78ff(a), and Title 18, United States Code, Section 2.

A TRUE BILL

_____

Grand Jury Foreperson

_Philip R. Sellinger_

PHILIP R. SELLINGER
UNITED STATES ATTORNEY

GLENN S. LEON
CHIEF, FRAUD SECTION
CRIMINAL DIVISION

25

CASE NUMBER: 24-402(EP)

# United States District Court
# District of New Jersey

## UNITED STATES OF AMERICA

v.

## ZHENGMING PAN

# INDICTMENT FOR
18 U.S.C. § 371
15 U.S.C. §§ 78dd-1 and 78ff(c)(2)(A)
15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), and 78ff(a) and 78ff(c)(2)(A)
18 U.S.C. § 2

A True Bill,



Foreperson

PHILIP R. SELLINGER
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

JENNIFER S. KOZAR
ASSISTANT U.S. ATTORNEY
JIL SIMON
LIGIA MARKMAN
TRIAL ATTORNEYS, U.S. DEPARTMENT OF JUSTICE, CRIMINAL DIVISION